No. 2024-10561

---

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

United States of America,
Plaintiff-Appellee
v.

Katrina Lawson,
Defendant-Appellant

---

On Appeal from the United States District Court
for the Northern District of Georgia
Newnan Division
3:21-cr-00006-TCB-RGV

---

BRIEF OF DEFENDANT-APPELLANT

---

Aaron Spolin
Caitlin Dukes
Spolin & Dukes P.C.
11500 W. Olympic Blvd., Ste 400
Los Angeles, CA 90064
310-424-5816

# Certificate of Interested Persons

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, listing the parties and entities interested in this

appeal, as required by 11th Cir. R. 26.1.

| | |
|---|---|
| Miguel R. Acosta | Counsel for United States |
| Aaron Spolin | Counsel for Appellant |
| Amanda R. Clark Palmer | Counsel for Appellant (former) |
| Garland Samuel & Loeb, P.C. | Counsel for Appellant (former) |
| Hon. Timothy C. Batten, Sr. | Trial Judge |
| Alex R. Sistla | Counsel for United States |
| Christopher J. Huber | Counsel for Appellee |
| Norman L. Barnett | Counsel for United States |
| Katrina Lawson | Appellant |
| Caitlin Dukes | Counsel for Appellant |
| Spolin & Dukes P.C. | Counsel for Appellant |
| Sarah Klapman | Counsel for United States |

**Statement Regarding Oral Argument**

Katrina Lawson respectfully submits that oral argument would be helpful to the disposition of this appeal which involves complex and novel issues of law and which affects countless individuals who file DS-160 online nonimmigrant visa applications each and every day. Lawson respectfully submits that oral argument is necessary to the just resolution of this appeal, and that it will significantly enhance the decision-making process.

## Table of Contents

Statement of Jurisdiction .................................................................... 1

Statement of the Issues ..................................................................... 1

Statement of the Case ....................................................................... 1

    A.    Proceedings Below ................................................................1

    B.    Statement of Facts................................................................5

            *Jonathon Banks*.................................................................. 5

            *Nora Hobbie* ...................................................................... 6

            *Kandace Zelaya* ................................................................. 7

            *Matthew Rintoul*................................................................. 8

            *Samantha Beechan*.............................................................. 8

            *Inspector Daryl Greenberg*................................................. 9

            *Jeffrey Moffett* ................................................................. 14

            *Stephanie Robinson-Cooper* .................................................. 15

            *Dawn Boring*.................................................................... 16

            *India Middleton* ............................................................... 16

            *Victor William Montgomery* ................................................ 17

    *Adarin Jones* ............................................................................ 18

    *Linda Downing* ......................................................................... 19

    *Motion for Directed Verdict* .................................................... 20

    *Jury Verdict* ............................................................................. 21

Summary of Argument……………………………………………………..21

Argument................................................................................................ 22

    I.      The Court Erroneously Denied Ms. Lawson's Motion to Suppress…………………………………………………………….21

    II.    There was Insufficient Evidence to Convict Ms. Lawson on Counts 2, 3, 4, 5, 6, 7, 8, 11, 12, and 13. …………………………………32

Conclusion.............................................................................................. 47

# Table of Authorities

## Cases

*City of Ontario Cal. v. Quon*, 560 U.S. 746 (2010) ..................................... 27

*Illinois v. McArthur*, 531 U.S. 326 (2001) ................................................... 24

*In re* Winship, 397 U.S. 358 (1970) ............................................................. 40

*Riley v. California,* 134 U.S. 2473 (2014) ............................................. 23, 27

*United States v. Babcock*, 924 F.3d 1180 (11th Cir. 2019) ................... 27, 28

*United States v. Burgard*, 675 F.3d 1029 (7th Cir. 2012) ........................... 29

*United States v. Christie*, 717 F.3d 1156 (10th Cir. 2013) .......................... 29

*United States v. Holt*, 777 F.3d 1234 (11th Cir. 2015) ............................... 21

*United States v. Jacobsen,* 466 U.S. 109 (1984) ......................................... 23

*United States v. Laist*, 702 F.3d 608 (11th Cir. 2012) ..................... 24, 26, 30

*United States v. Martin*, 157 F.3d 46 (2d Cir. 1998) .................................. 29

*United States v. Mercer*, 541 F.3d 1070 (11th Cir. 2008) .......................... 21

*United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009) ............... 3, 23, 27

*United States v. Morgan*, 713 F. App'x 829 (11th Cir. 2017) ............... 24, 28

*United States v. Pratt*, 915 F.3d 266 (4th Cir. 2019) .................................. 29

*United States v. Sanchez,* 722 F.2d 1501 (11th Cir.) ................................... 31

*United States v. Villegas*, 911 F.2d 623 (11th Cir. 1990) ........................... 31

## Statutes

18 U.S.C. § 1344 ............................................................... 42

18 U.S.C. § 1349 ................................................................. 1

18 U.S.C. § 1957 .......................................................... 2, 44

18 U.S.C. § 3231 ................................................................. 1

18 U.SC. § 1343 ........................................................... 1, 42

18 USC § 1341 ................................................................... 2

28 U.S.C. § 1291 ................................................................. 1

## Other Authorities

U.S. Const. Amend. IV. ...................................................... 23

## Statement of Jurisdiction

The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered final judgment on February 21, 2024. (Doc. 463.)[1] Appellant Katrina Lawson filed a timely notice of appeal on February 22, 2024. (Doc. 464.) The jurisdiction of this Court rests on 28 U.S.C. § 1291.

## Statement of the Issues

1)  Whether the District Court erred when it denied Ms. Lawson's Motion to Suppress evidence derived from her cell phone?

2)  Whether there was sufficient evidence to convict Ms. Lawson on Counts 2, 3, 4, 5, 6, 7, 8, 11, 12, and 13 beyond a reasonable doubt?

## Statement of the Case

### A.  Proceedings Below

On April 20, 2021, Katrina Lawson ("Appellant" or "Lawson") was indicted on thirteen counts. In count one, Lawson was indicted for conspiracy to commit wire fraud pursuant to 18 USC § 1349. In counts two to nine, Lawson was indicted for wire fraud pursuant to 18 USC § 1343. In counts ten and eleven, she was indicted for bank fraud pursuant to 18 USC § 1343. In

---

[1] "Doc." refers to the district court docket number. RT refers to the Stenographically Reported Official Court Transcript.
.

count twelve, Lawson was indicted for mail fraud pursuant to 18 USC § 1341 and in count thirteen, she was indicted for money laundering pursuant to 18 USC § 1957. (Doc. No. 126).

Lawson was charged with conspiring with other people to defraud the federal government and banks by submitting Paycheck Protection Program and Economic injury Disaster Loan applications to the U.S. Small Business Administration knowing that those applications contained false information. She was also charged with several counts of bank fraud, mail fraud and wire fraud related to this alleged conduct. The conduct was alleged to have occurred in the summer of 2020. Lawson pled not guilty to the charges. (1 RT 4).

Lawson was arrested on March 18, 2021, in Houston, Texas. (Doc. No. 31 at 3). That same day, a magistrate judge in the Southern District of Texas released Lawson on a $100,000 unsecured bond with certain conditions. (Id. at 6-9). According to the Superseding Indictment, Lawson was the mastermind of a Paycheck Protection Program and Economic Injury Disaster Loan scheme that involved submission of fraudulent applications for business advances and forgivable loans on behalf of dozens of co-conspirators who did not actually own businesses. Much of the scheme was perpetrated by use of

cell phones, which the co-conspirators used to exchange information for the fraudulent applications. (Doc. No. 126 ¶¶ 15-30).

On August 23, 2021, Lawson filed a Motion to Suppress Evidence obtained or derived from her phone. (Doc. No. 221). By way of this motion, Lawson sought to suppress the information obtained from the search conducted of her phone. The motion argued, under *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009), that there was an unreasonable delay in between seizure of the phone on March 18, 2021, when she was arrested and March 31, 2021, when the judge signed the search warrant. (Id. at 4-5; Doc. No. 221-1.1).

On October 6, 2021, the Court held an evidentiary hearing on Lawson's motion. On February 2, 2022, Magistrate Judge Vineyard filed a report and recommendation which recommended that Lawson's motion to suppress be denied. (Doc. 300). On March 30, 2022, the District Court adopted the Magistrate's report and recommendation over Lawsons' objections. (Doc. 314). On March 28, 2023, Lawson's jury trial commenced. (Doc. 396). On March 31, 2023, Lawson was found guilty on all 13 counts. (Doc. 407).

On April 25, 2023, a Motion for Bond pending sentencing was filed by Lawson. (Doc. 417). On April 26, 2023, the Motion for Bond was denied by Judge Timothy C. Batten, Sr. (Doc. 418).

On July 6, 2023, Lawson filed a Motion to Dismiss for Lack of Jurisdiction. (Doc. 423). On July 20, 2023, Lawson filed a Motion for Release from Custody pending Sentencing. (Doc. 424). On July 21, 2023, Lawson's Motion to Dismiss and Motion for Release were denied. (Doc. 425).

On December 19, 2023, a Motion for Preliminary Order of Forfeiture for Direct Assets and a Motion for Order of Forfeiture for Money Judgment were filed against Lawson. (Doc. 453). The Motions were amended on February 9, 2024. (Doc. 461). On February 8, 2024, an Oral Motion for Bond was made by Lawson. On the same day, Lawson's Motion for Bond was denied. (Doc. 460).

On February 14, 2024, the court issued Judgment and Commitment for Lawson, which was entered into the court record on February 21, 2024. Counts 1-13 were dismissed as per Standing Order 07-02. Lawson was convicted and sentenced for counts 1-13 of the superseding indictment. She was sentenced to 135 months (11 years and 3 months) in the CBOP for counts 1-12 and 120 months (10 years) for count 13, to be served concurrently. A supervised release term of 3 years was ordered as to counts 1-9 and 12-13, and a supervised release term of 5 years was ordered as to counts 10 and 11, to run concurrently for a total of 5 years. Lawson was ordered to pay a

restitution amount of $2,279,664.00 to the payee specified by the United States Attorney's Office (USAO). (Doc. 463).

On February 22, 2024, Lawson filed a notice of appeal. (Doc. 464). On the same day, Lawson filed a motion for leave to appeal in forma pauperis, which was granted by the court on March 4, 2024. (Doc. 465, 471). On February 27, 2024, Lawson submitted a Motion for Reduction of Sentence, which was denied on March 4, 2024. (Doc. 446, 466, 472).

### B. Statement of Facts

Lawson, a traveling nurse, had previously served as a Fulton County Sheriff's Deputy. She has a young son who is 9 or 10 years old and a daughter who is 24 or 25 years old. (1 RT 105-106). The trial began on March 28, 2023. (1 RT 1).

*Jonathon Banks*

Banks, a postal inspector team leader with the US Postal Inspection Service, was responsible for investigating crimes involving the U.S. mail. (1 RT 114). On August 11, 2020, Banks conducted a search in Alicia Quarterman's house in Fayetteville, Georgia, in relation to a drug investigation. (1 RT 115-116, 132). Banks found $15,200 cash and a notebook with some individuals' names and monetary amounts, at Alicia Quarterman's house. Banks suspected fraud and brought in a fraud investigator, Inspector

Daryl Greenberg. (1 RT 125-128). Banks also obtained Alicia Quarterman's cell phone to conduct a search. (1 RT 129). Banks saw conversations about PPP loans and EIDL loans in Alicia Quarterman's phone, and text messages between Lawson and Alicia Quarterman. (1 RT 130-131).

*Nora Hobbie*

Hobbie was an attorney advisor at Small Business Administration (SBA) and oversaw the fraud teams. (1 RT 137). Hobbie testified that the Economic Injury Disaster Loan (EIDL) was intended to assist small businesses, and in 2020 the CARES Act made a provision for EIDL related to the pandemic. (1 RT 138-139). The CARES Act waived the requirement of tax transcripts to provide speedy assistance. (1 RT 140). The CARES Act authorized advances of up to $10,000 on EIDL applications which were to be paid out regardless of whether the loan application itself was ultimately approved or not. (1 RT 141). In order to qualify for an EIDL advance, the only requirement was to have an operational business. (1 RT 143). The SBA relied on information contained in the application in order to make a determination whether one was eligible for an EIDL advance and whether the information was accurate for an EIDL loan. (1 RT 152-153). SBA required disclosure if the application was prepared by a third-party. (1 RT 154-155). Corporations, sole proprietors and independent contractors were eligible for EIDL loan or

grant, based on their credit score. (1 RT 165-166). Hobbie was not sure if the SBA policy of granting more loans on the basis of the number of employees was known to the public because the CARES Act did not specify how the funds were allocated. (1 RT 166-168). Hobbie agreed that taking somebody's help to fill out an EIDL application was not prohibited and a person helping with the application was allowed to charge up to $2500 as fee. (1 RT 168).

*Kandace Zelaya*

Zelaya testified that she was a trial attorney at SBA. (1 RT 174). Paycheck Protection Program (PPP) was another COVID-relief program by SBA, in addition to EIDL. The main purpose of PPP was to protect the payroll and the paychecks of the employees of the small businesses. (1 RT 175-176). In order for the loan to be forgiven, a business had to use at least 60 percent on payroll costs. (1 RT 176). The amount of loan that an individual could receive under the PPP depended on average monthly payroll that was paid in 2019 or the 12 months immediately preceding the application. That amount was multiplied by two and a half to get the maximum loan amount for a particular business. (1 RT 182). Zelaya explained the application process with respect to PPP. (1 RT 184). A business could take assistance from a third-party to apply for the loan and the third-party could charge a fee for that

service. (1 RT 193-194, 209). Independent contractors and sole proprietors could use PPP proceeds for personal expenses. (1 RT 211-212).

*Matthew Rintoul*

Rintoul worked for the U.S. Postal Inspection Service and investigated cases of mail fraud among other things. (2 RT 226). On March 18, 2021, Rintoul executed the arrest warrant against Lawson for fraud related to EIDL or PPP loans. (2 RT 227-228, 249). Rintoul seized a red iPhone, a Mercedes SUV and a Suzuki motorcycle from Lawson's house. (2 RT 229-235). Rintoul conducted Lawson's interview in the presence of Inspector Shadowens and Inspector Diaz. (2 RT 238). Rintoul turned over the seized red iPhone to case agent Greenberg in Atlanta. (2 RT 241). Lawson was calm and cooperated with the police. (2 RT 244, 247, 253).

*Samantha Beechan*

Beechan testified that she was a program manager at Cross River Bank whose role was limited to PPP. (2 RT 254-255). A business had to be in operation as of February 15, 2020, to qualify for PPP. (2 RT 258). Beechan explained the process of applying for a PPP loan through Cross River Bank. (2 RT 260-265). There were PPP applications with the names of Katrina

Lawson, Victor Montgomery, Arielle Dozier and Alicia Quarterman within Cross River Bank's business records. (2 RT 271-265).

*Inspector Daryl Greenberg*

Inspector Greenberg was the lead case agent for the case against Lawson and several other co-defendants. Inspector Banks had handed over the journal/notebook seized from Alicia Quarterman's house to Inspector Greenberg, suspecting a fraud. (2 RT 292). Greenberg examined Alicia Quarterman's cell phone extraction and tried to relate it to seized journal. (2 RT 295). Lawson's counsel objected to the admission of the hearsay in the text messages between Alicia Quarterman and Lawson. The court overruled the objection. (2 RT 297-299). Text string conversation between Alicia Quarterman and Darryl Washington were found. (2 RT 300). Inspector Greenberg testified that India Middleton, James McFarland, Katie Quarterman, Nikia Wakefield, Tranesha Quarterman and Adrian Jones submitted their application for an EIDL and/or PPP loan through Alicia Quarterman to Lawson. (2 RT 301-306). Inspector Greenberg testified that Lawson sent text messages to Alicia Quarterman describing the EIDL scheme and asking her to get other participants for the scheme. Alicia Quarterman sent text messages to different individuals telling them about the scheme and asking them to send the details required to apply for EIDL. Alicia Quarterman

would then send the information to Lawson who would apply for EIDL and send a screenshot of completed EIDL application to Alicia Quarterman who would then send it to the person who originally applied. (2 RT 307). The same process repeated for PPP grants or loans. (2 RT 308). Inspector Greenberg obtained bank statements of India Middleton, James McFarland, Lawson, Caitlyn Hodgens, Nikia Wakefield, Tranesha Quarterman, Victor Montgomery, Alicia Quarterman, Darryl Washington, Adarin Jones and Justin McLennan. (2 RT 310-315, 432).

The court admitted Lawson's video receiving her Mercedes Benz into evidence over defense counsel's objection. (2 RT 319-323). Inspector Greenberg believed that Lawson bought a Mercedes and a motorcycle from the proceeds of fraudulent funds. (2 RT 324-325). He attributed over 200 different EIDL applications with Lawson because the names of the persons who applied for the loan were found in Lawson's phone. (2 RT 330). A search on the Georgia Secretary of state website did not return any results for a business with the names of Adarin Jones (or Adrian Jones), Alicia Quarterman, Arielle Dozier, Darryl Washington, India Middleton, Jeffrey Moffett, Katie Quarterman, Katrina Lawson, Nikia Wakefield, Tranesha Quarterman (2 RT 331-337). A result found for the name of James McFarland showed that a company with that name was established in 2008 but was

revoked by the Georgia secretary of state in 2010. (2 RT 333-334). A result was also found for the name of Stephanie Cooper (on whose behalf Lawson allegedly submitted an EIDL application), which was incorporated in 1998 but the business was dissolved in 2008. (2 RT 334-335, 347).

Inspector Rintoul handed over Lawson's phone to Inspector Greenberg, who then handed it over to Georgia Department of corrections' digital forensics lab for examination. (2 RT 342-343). Inspector Greenberg testified that the text messages showed that Lawson had reached out to other people in addition to Alicia Quarterman for the purposes of submitting loans. (2 RT 346). Lawson submitted loan applications for Jeffrey Moffett and Justin McLennan. (2 RT 348-350). Text messages were exchanged between Lawson and Alicia Quarterman, discussing the loans. One of the messages sent by Lawson read, "so we're going to charge 2,000 for me to do the application. They will get 10,000 deposited in their account and they got to send me 2,000. And I'll split it with you for every person you get. So, we each can get a thousand apiece off each person." (2 RT 351-355). There were Zelle transactions between Lawson and Alicia Quarterman. (2 RT 363-365). Text messages were exchanged between Alicia Quarterman and Nikia Wakefield. Payments were made to Alicia Quarterman by Nikia Wakefield, Darryl Washington, Adrian Jones, James McFarland (2 RT 371-372, 376, 378). India

Middleton did not receive any advance from SBA but received a loan of $5,500. (2 RT 386). Latrell Solomon sent her information to Lawson in connection with PPP loan. (2 RT 413). Inspector Greenberg tracked payments from Justin McLennan to Lawson. (3 RT 432). During her interview with Inspector Rintoul, Lawson told him that she charged $1,000 for her help and knowledge filling out EIDL applications. (3 RT 441). Inspector Greenberg admitted sitting down with the Government counsel and discussing an outline of expected topics and exhibits and what Inspector Greenberg's trial testimony would be. (3 RT 444). The bank statements reviewed by Inspector Greenberg were only for a specific timeframe in 2020 and did not include statements from 2019. (3 RT 448). Lawson purchased Mercedes and motorcycle before she received checks of $16,000 in October 2020. (3 RT 449-450). Inspector Greenberg admitted that Lawson may have other bank accounts and it was possible that her salary from Houston Rockets was going into other bank accounts that Inspector Greenberg may not be aware of. (3 RT 453-454). Inspector Greenberg admitted that it was possible that a business does not necessarily have to be registered with the Georgia Secretary of State. (3 RT 457-458). He also agreed that Alicia Quarterman was the middle person between Lawson and others and therefore there was no direct connection between Lawson and others, for instance, Adrian Jones, India Middleton

never talked to Lawson. (3 RT 468, 482). There were times when Alicia Quarterman quoted higher fee to others than what she discussed with Lawson, and she did not reveal this to Lawson. (3 RT 469). Alicia Quarterman told people through text messages to trust her, that everything they were doing was legal and that there was nothing wrong with what she was doing. (3 RT 476-479, 483).

Inspector Greenberg did not conduct a search of Lawson's business in Texas even though her PPP application indicated that her business was located in Texas and not in Georgia. (3 RT 497). Likewise, Inspector Greenberg did not search for the businesses of Nikia Wakefield and Victor Montgomery in the states where their applications indicated their businesses were located. (3 RT 496-498).

Defense counsel argued that the Government did not put forth any evidence showing that Lawson engaged in an intentional action to avoid learning whether the information that was being provided to her for the EIDL and PPP applications was accurate. The Government contended that Lawson deliberately avoided to verify that information. The court allowed the charge. (3 RT 427-428).

*Jeffrey Moffett*

On June 16th, 2022, Moffett was charged with conspiracy to obtain government money and pled guilty to the charge. Moffett was a Fulton County Sheriff's deputy at that time. He retired after pleading guilty in order to potentially avoid termination. (3 RT 514-515). Moffett knew Lawson because they worked together at the Fulton County Sheriff's Office, years ago. (3 RT 515). Lawson informed Moffett about the EIDL advance and applied for the advance on Moffett's behalf. (3 RT 517). Moffett ultimately received a grant of $10,000 out of which he paid $1000 to Lawson. (3 RT 518). Moffett testified that Lawson also contacted him about PPP grant and said that he could get $20,000 through PPP. (3 RT 519). Ultimately, Moffett did not receive $20,000 PPP loan. (3 RT 520). Lawson informed Moffett that what they were doing was "totally legal". (3 RT 521). Moffett testified that some of the information filled up in the application was not accurate. (3 RT 526-527). On September 13, 2021, Investigator Greenberg told Moffett that he could get a target letter and could have his lawyer contact the Government lawyer and if he does not do that, he could get indicted for conspiracy. (3 RT 538). Moffett was concerned about facing any criminal charge and ultimately Moffett's lawyer came to an agreement with the Government lawyer that Moffett could plead guilty to a misdemeanor and not a felony. (3 RT 539-

540). Moffett was not sentenced for the misdemeanor till the time he testified at trial because that was a part of his agreement with the Government. (3 RT 541).

*Stephanie Robinson-Cooper*

Cooper was terminated from Fulton County Sheriff's Office because she misled about her work hours. (3 RT 551-553). Cooper knew Lawson because they worked together at the Fulton County jail. (3 RT 555). On July 4, 2020, Lawson texted Cooper if she wanted to make $10,000, and informed her about the COVID relief grant and that she would charge $2000 to complete the application for the grant. (3 RT 559, 561). Lawson charged Cooper $2000 for filling out her application. (3 RT 570). On December 31, 2020, Lawson reached out to Cooper asking her if she wanted to apply for the grant again. (3 RT 574). Cooper agreed to let Lawson apply for the grant on her behalf. (3 RT 576). Cooper's application for the grant was rejected the second time. (3 RT 578). Cooper pled guilty and was hoping to avoid jail and to get leniency from the Government and from the judge by cooperating with the Government. (3 RT 586-587). Inspector Greenberg questioned Cooper and informed her about getting the target letter, which would enable Cooper's lawyer to have a discussion with the Government lawyer. (3 RT 595-596).

Cooper agreed to plead guilty to a misdemeanor pursuant to the plea agreement with Government lawyer. (3 RT 597).

*Dawn Boring*

Boring, who was employed with the Georgia Department of Labor, testified that an independent contractor with ten employees would have to register with the Georgia Department of Labor. Inspector Greenberg provided Boring with the names and Social Security numbers of Lawson, Alicia Quarterman, Adrian Jones, Nikia Wakefield, Tranesha Quarterman, Darryl Washington, James McFarland, Katie Quarterman, Victor Montgomery, India Middleton, Stephanie Cooper, Jeffrey Moffett, Arielle Dozier and Helping Hands Recovery Home to check if the Department of Labor had a registered business with their names. (3 RT 604-607). Boring agreed that if a business had employees working in a state other than Georgia, the business would not need to register with the Georgia Department of Labor. (3 RT 610-611).

*India Middleton*

Middleton was Alicia Quarterman's cousin. (3 RT 615). Alicia Quarterman informed Middleton that she could get a $10,000 EIDL grant. (3 RT 617). Middleton did not know Lawson. (3 RT 618). Alicia Quarterman did not send the application to Middleton for verification before submitting it.

(3 RT 623-624). Middleton's business entered in EIDL application was a hair and nail salon. Middleton actually occasionally groomed people's hair. (3 RT 626, 651-652). Alicia Quarterman told Middleton that her loan was not approved. However, Middleton received a loan of $5,500 from SBA. (3 RT 627-628). Alicia Quarterman also informed Middleton about the PPP loan. (3 RT 633). Middleton was denied the PPP loan. (3 RT 637). Middleton pled guilty to misdemeanor and had not been sentenced till the time of her testimony. Middleton admitted that she cooperated with the Government lawyer because she hoped the Government and the judge to show her some leniency. (3 RT 643-644).

*Victor William Montgomery*

Montgomery was charged by the Government with conspiracy to commit theft of government money amounting to $20,630. Montgomery signed a plea agreement and agreed to cooperate with the Government because he was hoping for some consideration from the judge. (3 RT 662). Nikia Wakefield was Montgomery's girlfriend. (3 RT 663). In 2020, Wakefield told Montgomery that her cousin, Alicia Quarterman, could get Montgomery approved for a small business loan of $10,000, out of which $2000 would be the fee to get him approved. (3 RT 663). An EIDL application was submitted on Montgomery's behalf by Alicia Quarterman, which was

ultimately denied. Montgomery had never heard Lawson's name. (3 RT 663-664). In July 2020, Wakefield told Montgomery about another loan he could possibly get approved for. Wakefield told the loan amount Montgomery would get would be $20,000 out of which $10,000 should be paid as fee. (3 RT 665). Montgomery ultimately received $20,000 on August 31, 2020, and sent a $10,000 check to Alicia Quarterman through USPS. (3 RT 666-667). Montgomery was not a business owner or a sole proprietor in 2020. (3 RT 676-677). Montgomery looked up SBA loans online to ensure it was a legitimate program. (3 RT 680-681).

*Adarin Jones*

Jones met Alicia Quarterman when he was a store manager at the Tyrone. They were friends and romantic partners for a short period of time. (3 RT 687-688). Alicia Quarterman told Jones that she could get him a $10,000 COVID grant that was forgivable, out of which she were to charge $2,000. (3 RT 689-690, 697-698). Jones did not know Lawson. (3 RT 692; 4 RT 718, 719). Jones was charged by the Government with conspiracy in regard to the COVID grant and Jones pled guilty to it. (3 RT 694). Jones' mother also obtained an EIDL grant through Alicia Quarterman. (3 RT 703-704).

*Linda Downing*

Downing was involved in complex fraud and financial investigations for the United States Attorney's office. (4 RT 726). Downing investigated Lawson's bank statements to determine where her money was coming from and where it was going. (4 RT 727-728). The fee charged by Lawson for filing EIDL and PPP applications varied and Downing did not know the reason for this variance. (4 RT 729). Downing reviewed text messages of Lawson, Alicia Quarterman, as well as some of the other applicants who texted Lawson. Downing also reviewed the actual EIDL or PPP applications. (4 RT 732). Downing suspected that at least $1,80,000 worth of grants were paid out to applicants who filed fraudulent EIDL and PPP applications or received fraudulent EIDL and PPP loans. (4 RT 740-741). Downing testified that she was able to trace $49,500 from Lawson's Bank of America account (excluding $15,000 which was received through CashApp), $21,000 from Lawson's Capital One bank account, $35,701 from Lawson's bank account in JPMorgan Chase, $10,026 from CashApp, $8,000 from Navy Federal Credit Union account, $17,000 from Wells Fargo account and $19,500 from another Wells Fargo account. (4 RT 744-746). According to Downing, Lawson used money from five different bank accounts to purchase her Mercedes-Benz. (4 RT 756, 780). Downing testified that she was able to trace the funds used by

Lawson to purchase Mercedes-Benz, Suzuki motorcycle and to pay off for Infinities to the money received by Lawson from filling out applications for EIDL and PPP grants. (4 RT 754-761, 784-794). Ronald Solomon sent an introductory text message to Lawson on July 28, 2020, which was well after the loan was funded to Solomon on July 2, 2020. Downing agreed that just because Solomon was granted a loan, it did not imply that the loan was taken fraudulently as a part of the alleged scheme because Solomon did not even know Lawson at the time. (4 RT 798-799). Downing agreed that she could not be certain that the amount used by Lawson from her bank account to pay for Mercedes or for making other payments came from a particular source. (4 RT 806-808).

*Motion for Directed Verdict*

Lawson's counsel made a motion for a directed verdict of acquittal on counts 2, 3, 4, 5, 6, 7, 8, and 12. The counsel argued that with regards to the EIDL application, there was no affirmative evidence from which the jury could conclude that Lawson knew about the basis on which the SBA was determining who to grant the loans to. (4 RT 812-813). Counsel also argued that on some counts involving allegations against Lawson, there was no evidence presented to show that the information in EIDL applications was false. Lastly, counsel argued that the government could not prove that the

20

alleged transaction involved property or funds that were the proceeds of some criminal activity and that the property or funds had a value of more than $10,000, specifically tied to money that came from people who testified during the trial or people whose applications were looked at during the course of the trial. (4 RT 813-815). The court denied the motion. (4 RT 817).

*Jury Verdict*

The jury convicted Lawson on all 13 counts. (4 RT 898).

## Summary of Argument

The District Court erroneously denied Lawson's motion to suppress evidence obtained from her phone as the government's delay in obtaining a search warrant and conducting the search violated her Fourth Amendment rights.

Moreover, the evidence was insufficient to convict Lawson of counts 2, 3, 4, 5, 6, 7, 8, 11, 12 and 13. With reference to the EIDL applications, there was no affirmative evidence presented from which the jury could conclude that Lawson knew about the basis on which the SBA was determining who to grant the loans to. Additionally, there was no evidence presented by the government to show that the information in the EIDL applications was false. The government also failed to present evidence from

which a jury could be certain that the financial amounts used by Lawson from her bank account to make certain payments came from a particular source.

## Argument

### I. The Court Erroneously Denied Ms. Lawson's Motion to Suppress

#### A. Standard of Review

In reviewing a district court's denial of a motion to suppress, this Court reviews the findings of fact for clear error and the application of law to those facts *de novo. United States v. Mercer*, 541 F.3d 1070, 1073–74 (11th Cir. 2008); *United States v. Holt*, 777 F.3d 1234, 1255–56 (11th Cir. 2015)).

#### B. Pertinent Facts

Lawson was charged with conspiring with other people to defraud the federal government and banks by submitting Paycheck Protection Program and Economic injury Disaster Loan applications to the U.S. Small Business Administration knowing that those applications contained false information. She was also charged with several counts of bank fraud, mail fraud and wire fraud related to this alleged conduct. The conduct was alleged to have occurred in the summer of 2020. Lawson pled not guilty to the charges. (1 RT 4).

She was arrested on March 18, 2021, in Houston, Texas. (Doc. No. 31 at 3). That same day, a magistrate judge in the Southern District of Texas released Lawson on a $100,000 unsecured bond with certain conditions. (Id. at 6-9). According to the Superseding Indictment, Lawson was the mastermind of a Paycheck Protection Program and Economic Injury Disaster Loan scheme that involved submission of fraudulent applications for business advances and forgivable loans on behalf of dozens of co-conspirators who did not actually own businesses. Much of the scheme was perpetrated by use of cell phones which the co-conspirators used to exchange information for the fraudulent applications. (Doc. No. 126 ¶¶ 15-30).

On August 23, 2021, Lawson filed a Motion to Suppress Evidence obtained or derived from her phone. (Doc. No. 221). By way of this motion, Lawson sought to suppress the information obtained from the search conducted of her phone. She argued that there was an unreasonable delay in between seizure of the phone on March 18, 2021, when she was arrested and March 31, 2021, when the judge signed the search warrant. (Id. at 4-5; Doc. No. 221-1.1).

On October 6, 2021, the Court held an evidentiary hearing on Lawson's motion. On February 2, 2022, Magistrate Judge Vineyard filed a report and

recommendation which recommended that Lawson's motion to suppress be denied. (Doc. 300). On March 30, 2022, the District Court adopted the Magistrate's report and recommendation over Lawsons' objections. (Doc. 314).

### C. Legal Background

The Fourth Amendment provides that "the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. With respect to the type of electronic device at issue in this case, it is now well-established that, while "it is constitutionally reasonable ... to seize 'effects'…without a warrant [when] probable cause [exists] to believe they contain contraband," law enforcement must obtain a search warrant to search a cell phone or computer unless exigent circumstances apply. See also, *Riley v. California,* 134 U.S. 2473 (2014); *United States v. Jacobsen,* 466 U.S. 109,121-22 (1984); *United States v. Mitchell,* 565 F.3d 1347 (11th Cir. 2009).

However, even a seizure that may be "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth

Amendment's prohibition against unreasonable searches." *Jacobsen,* 466 U.S. at 124.

"A temporary warrantless seizure supported by probable cause is reasonable as long as 'the police diligently obtained a warrant in a reasonable period of time.'" *United States v. Morgan*, 713 F. App'x 829, 831 (11th Cir. 2017)(citing *United States v. Laist*, 702 F.3d 608, 613 (11th Cir. 2012)(quoting *Illinois v. McArthur*, 531 U.S. 326, 334, 121 S.Ct. 946, 951–52, 148 L.Ed.2d 838 (2001)). To determine if the intrusion was reasonable under the Fourth Amendment, courts must evaluate the totality of the circumstances presented in each case, balancing the privacy-related and law-enforcement-related concerns. *Id*.

### D. Argument

Lawson asserts that the District Court erroneously denied her motion to suppress evidence obtained from her phone as the government's delay in obtaining a search warrant and conducting the search violated her Fourth Amendment rights.

Even a seizure that may be "lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition against unreasonable searches." *Jacobsen,* 466

U.S. at 124. Thus, if law enforcement unreasonably delays obtaining a warrant to search the item after seizing it, an otherwise reasonable seizure may become unreasonable. See *Mitchell,* 565 F.3d at 1350. The reasonableness of the delay is determined "in light of all the facts and circumstances" and "on a case-by-case basis." *Id.* at 1351.

Ms. Lawson's cell phone was taken from her during her arrest, on March 18, 2021, without her permission and without a warrant. Thirteen days later, the government sought and obtained a search warrant to search her phone. That search warrant was executed on April 6, 2021, nineteen days after the phone's seizure. The search warrant application did not provide any explanation as to why the government waited almost two weeks to take any action regarding the phone, nor does it indicate that Ms. Lawson was informed when or whether she could expect to get her phone back. Ms. Lawson asserts that the delay between seizing her cell phone and obtaining a search warrant was unreasonable and thus, the District Court erred when it denied her motion to suppress.

In *Mitchell,* this Court highlighted the importance of avoiding unreasonable delays when obtaining a search warrant and conducting a search. There, agents seized a computer hard drive from the home of the defendant, believing that the hard drive contained child pornography.

*Mitchell,* 565 F.3d at 1349. The agent tasked with searching the hard drive

waited three weeks before obtaining a search warrant and conducting the

search. *Id.* at 1349-50. The defendant moved to suppress the evidence

discovered as a result of the search, arguing that the agent's delay in

obtaining a search warrant was unreasonable. *Id.* at 1350. The Government

argued that the agent was unavailable for two weeks after the initial seizure

of the hard drive because he was attending a training course, and therefore

the delay was justified and reasonable. *Id.* at 1349. Nonetheless, the

Eleventh Circuit held that the three-week delay in obtaining a search warrant

was unreasonable, and that the evidence obtained from the hard drive should

have been suppressed. *Id.* at 1352.

Noting the importance of individual privacy-related concerns, and the

need to prevent unreasonable intrusion, this Court has recognized that

individuals have strong interests in items that store private information, such

as computers. In *United States v. Laist*, this Circuit acknowledged that

"computers are a unique possession, one in which individuals may have a

particularly powerful possessory interest," because they store "personal

letters, e-mails, financial information, passwords, family photos, and

countless other items of a personal nature." 702 F.3d 608, 614 (11th Cir.

2012); *see also United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir.

27

2009) (calling a computer hard drive "the digital equivalent of its owner's home, capable of holding a universe of private information"); *see United States v. Babcock*, 924 F.3d 1180, 1189 (11th Cir. 2019)).

The United States Supreme Court has explained that "cell phones . . . place vast quantities of personal information literally in the hands of individuals." *Riley v. California*, 573 U.S. 373, 386 (2014). "Cell phones can store millions of pages of text, thousands of pictures, or hundreds of videos. This has several interrelated privacy consequences. First, a cell phone collects in one place many distinct types of information that reveal much more in combination than any isolated record. Second, the phone's capacity allows even just one type of information to convey far more than previously possible. Third, data on the phone can date back for years . . .a decade ago officers might have occasionally stumbled across a highly personal item such as a diary, but today many of the more than 90% of American adults who own cell phones keep on their person a digital record of nearly every aspect of their lives." *Id.* at 375.

In discussing the importance of phone privacy recognized by society, the Supreme Court has also explained that "cell phone and text message communications are so pervasive that some persons may consider them to be essential means or necessary instruments for self-expression, even self-

identification. That might strengthen the case for an expectation of privacy."
*City of Ontario, Cal. v. Quon*, 560 U.S. 746, 760 (2010).

Just as most cell phones, Ms. Lawson's phone stores a vast amount of personal and private information, and therefore the seizure of a phone, even if its battery is not charged at the time of its seizure, constitutes a significant interference with the owner's, and here Ms. Lawson's, interest in the phone.

In the instant case, when Ms. Lawson's cell phone was seized without consent the government should have promptly sought a warrant to authorize the phone's search and seizure as even the brief warrantless seizure of a cell has been found to be unreasonable. *See United States v. Babcock,* 924 F.3d 1180,1190-91 (11th Cir. 2019) (finding the two-day pre-warrant seizure of a cell phone unreasonable). By depriving Ms. Lawson of her cell phone for thirteen days before ever seeking a warrant, the government violated her right to be free from unreasonable searches and seizures.

There is nothing to suggest the delay was reasonable in the instant case as in *Morgan* for example, where this Court found that a delay in obtaining a search warrant for the defendant's phone was reasonable where the government diligently pursued the investigation as the agent began drafting the search warrant the first day after seizing the evidence. *United States v. Morgan*, 713 F. App'x 829, 831–32 (11th Cir. 2017). The Court

noted that although the agent was leaving town on another work assignment, he did not delay the warrant signing until his return. *Id*. Rather, he enlisted another agent to present the warrant to the magistrate judge and a third agent to deliver the evidence to the forensic analyst. *Id*. In Ms. Lawson's case, the delay was not justified, and the search warrant application did not even provide any explanation as to why the government waited almost two weeks to take any action regarding the phone. Additionally, because the cell phone search warrant affidavit contained largely duplicative information that was already found in the indictment, the delay in seeking the search warrant was unreasonable.

Other circuits have also ruled that "even a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant." *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998). Courts have explained why law enforcement may not unreasonably delay in seeking a warrant and have expressed that "unnecessary delays also undermine the criminal justice process in a more general way: they prevent the judiciary from promptly evaluating and correcting improper seizures." *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012); *see also United States v. Christie*, 717 F.3d 1156, 1162 (10th Cir. 2013) (Gorsuch, *J.*)("What, after all, is 'reasonable' about police seizing an individual's property on the

ground that it potentially contains relevant evidence and then simply neglecting for months or years to search that property to determine whether it really does hold relevant evidence needed for trial or is totally irrelevant to the investigation and should be returned to its rightful owner?")

In *United States v. Pratt*, 915 F.3d 266, 272-273 (4th Cir. 2019), the Fourth Circuit held that a 31-day delay violates the Fourth Amendment where the government neither proceeds diligently nor presents an overriding reason for the delay. The court in *Pratt* explained that the defendant did not consent to his phone's seizure or voluntarily share the phone's contents. *Id*. at 272. The government's only explanation for the 31-day delay in obtaining a warrant was that Pratt committed crimes in both North Carolina and South Carolina and agents had to decide where to seek a warrant. Id. The court found this explanation insufficient to justify the extended seizure of Pratt's phone. *Id*.

Similarly, in the instant case, the government did not provide any justification or reason as to why the government waited almost two weeks to take any action regarding Ms. Lawson's phone. Ms. Lawson also did not consent to her phone being taken or searched.

This Circuit has found a ten day delay reasonable where it was caused by the Defendant's withdrawal of consent after seizure, where the

application was complex, and where only one agent was available to prepare it in the geographic area. *United States v. Laist,* 702 F.3d 608, 617-18 (11th Cir. 2012). Here, however, law enforcement's delay was much more like the situation presented in *Mitchell* where "there was no compelling justification for the delay" as the search warrant could have been obtained if the government had acted diligently. *Mitchell,* 565 F.3d at 1351-52. There is no evidence that the agents attempted or planned to obtain a search warrant sooner, nor is there evidence that any external factors caused the delay. Moreover, unlike both *Mitchell* and *Laist,* at no point did Ms. Lawson consent to the phone's search or seizure or otherwise contribute to the government's delay by later revoking said consent.

Applying this Circuit's reasoning to the present case, the delays in obtaining a search warrant and conducting the search were unreasonable and thus constitute a substantial interference with Ms. Lawson's valid privacy interest in the phone. Accordingly, the District Court should have granted Ms. Lawson's motion to suppress as the evidence obtained was in violation of Ms. Lawson's Fourth Amendment rights.

## II. There was Insufficient Evidence to Convict Ms. Lawson on Counts 2, 3, 4, 5, 6, 7, 8, 11, 12, and 13.

### A. Standard of Review

The standard of review as to the sufficiency of the evidence is whether the evidence, when considered in the light most favorable to the government, proved the appellant guilty beyond a reasonable doubt. *United States v. Villegas*, 911 F.2d 623, 627 (11th Cir. 1990); *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984).

## B. Pertinent Facts

Nora Hobbie, an attorney advisor at the Small Business Administration (SBA), testified that the Economic Injury Disaster Loan (EIDL) was intended to assist small businesses, and in 2020 the CARES Act made a provision for EIDL related to the pandemic. (1 RT 138-139). The CARES Act waived the requirement of tax transcripts to provide speedy assistance. (1 RT 140). The CARES Act authorized advances of up to $10,000 on EIDL applications which were to be paid out regardless of whether the loan application itself was ultimately approved or not. (1 RT 141). In order to qualify for an EIDL advance, the only requirement was to have an operational business. (1 RT 143). The SBA relied on information contained in the application in order to make a determination of eligibility for an EIDL advance and whether the information was accurate for an EIDL loan. (1 RT 152-153). SBA required disclosure if the application was

prepared by a third-party. (1 RT 154-155). Corporations, sole proprietors and independent contractors were eligible for an EIDL loan or grant based on their credit score. (1 RT 165-166). Hobbie was not sure if the SBA policy of granting more loans on the basis of the number of employees was known to the public because the CARES Act did not specify how the funds were allocated. (1 RT 166-168). Hobbie agreed that taking somebody's help to fill out an EIDL application was not prohibited and a person helping with the application was allowed to charge up to $2500 as fee. (1 RT 168).

Inspector Greenberg was the lead case agent for the case against Lawson and several other co-defendants. Inspector Banks provided the journal seized from Alicia Quarterman's house to Inspector Greenberg, suspecting a fraud. (2 RT 292). Greenberg examined Alicia Quarterman's cell phone extraction and tried to relate it to the seized journal. (2 RT 295). Lawson's counsel objected to the admission of the hearsay in the text messages between Alicia Quarterman and Lawson. The court overruled the objection. (2 RT 297-299). Text string conversation between Alicia Quarterman and Darryl Washington were found. (2 RT 300). Inspector Greenberg testified that India Middleton, James McFarland, Katie Quarterman, Nikia Wakefield, Tranesha Quarterman and Adrian Jones submitted their application for an EIDL and/or PPP loan through Alicia

Quarterman to Lawson. (2 RT 301-306). Inspector Greenberg testified that

Lawson sent text messages to Alicia Quarterman describing the EIDL

scheme and asking her to get other participants for the scheme. Alicia

Quarterman sent text messages to different individuals telling them about the

scheme and asking them to send the details required to apply for EIDL.

Alicia Quarterman would then send the information to Lawson who would

apply for EIDL and send a screenshot of the completed EIDL application to

Alicia Quarterman who would send it to the individual who originally

applied. (2 RT 307).

The Court admitted Lawson's video receiving her Mercedes Benz into

evidence over defense counsel's objection. (2 RT 319-323). Inspector

Greenberg believed that Lawson bought a Mercedes and a motorcycle from

the proceeds of fraudulent funds. (2 RT 324-325). He attributed over 200

different EIDL applications with Lawson because the names of the persons

who applied for the loan were found in Lawson's phone. (2 RT 330). A

search on the Georgia Secretary of State website did not return any results

for a business with the names of Adarin Jones (or Adrian Jones), Alicia

Quarterman, Arielle Dozier, Darryl Washington, India Middleton, Jeffrey

Moffett, Katie Quarterman, Katrina Lawson, Nikia Wakefield, Tranesha

Quarterman (2 RT 331-337). A result found for the name of James

McFarland showed that a company with that name was established in 2008 but was revoked by the Georgia secretary of state in 2010. (2 RT 333-334). A result was also found for the name of Stephanie Cooper (on whose behalf Lawson allegedly submitted an EIDL application), which was incorporated in 1998 but the business was dissolved in 2008. (2 RT 334-335, 347). Inspector Rintoul handed over Lawson's phone to Inspector Greenberg, who then handed it over to Georgia Department of corrections' digital forensics lab for examination. (2 RT 342-343).

Inspector Greenberg testified that the text messages showed that Lawson had reached out to other people in addition to Alicia Quarterman for the purposes of submitting loans. (2 RT 346). Lawson submitted loan applications for Jeffrey Moffett and Justin McLennan. (2 RT 348-350). Text messages were exchanged between Lawson and Alicia Quarterman, discussing the loans. One of the messages sent by Lawson read, "so we're going to charge 2,000 for me to do the application. They will get 10,000 deposited in their account and they got to send me 2,000. And I'll split it with you for every person you get. So, we each can get a thousand a piece off each person." (2 RT 351-355). There were Zelle transactions between Lawson and Alicia Quarterman. (2 RT 363-365).

Text messages were exchanged between Alicia Quarterman and Nikia Wakefield. Payments were made to Alicia Quarterman by Nikia Wakefield, Darryl Washington, Adrian Jones, James McFarland (2 RT 371-372, 376, 378). India Middleton did not receive any advance from SBA but received a loan of $5,500. (2 RT 386). Latrell Solomon sent her information to Lawson in connection with PPP loan. (2 RT 413). Inspector Greenberg tracked payments from Justin McLennan to Lawson. (3 RT 432). During her interview with Inspector Rintoul, Lawson told him that she charged $1,000 for her help and knowledge filling out EIDL applications. (3 RT 441).

Inspector Greenberg admitted sitting down with Government counsel and discussing an outline of expected topics and exhibits and what Inspector Greenberg's trial testimony would be. (3 RT 444). The bank statements reviewed by Inspector Greenberg were only for a specific timeframe in 2020 and did not include statements from 2019. (3 RT 448). Lawson purchased a Mercedes and motorcycle before she received checks of $16,000 in October 2020. (3 RT 449-450). Inspector Greenberg admitted that Lawson may have other bank accounts and it was possible that her salary from Houston Rockets was going into other bank accounts that Inspector Greenberg may not be aware of. (3 RT 453-454). Inspector Greenberg admitted that it was possible that a business does not necessarily have to be registered with the

Georgia Secretary of State. (3 RT 457-458). He also agreed that Alicia Quarterman was the middle person between Lawson and others and therefore there was no direct connection between Lawson and others, for instance, Adrian Jones, India Middleton never talked to Lawson. (3 RT 468, 482). There were times when Alicia Quarterman quoted higher fee to others than what she discussed with Lawson, and she did not reveal this to Lawson. (3 RT 469). Alicia Quarterman told people through text messages to trust her, that everything they were doing was legal and that there was nothing wrong with what she was doing. (3 RT 476-479, 483).

Alicia Quarterman informed Middleton that she could get a $10,000 EIDL grant. (3 RT 617). Middleton did not know Lawson. (3 RT 618). Alicia Quarterman did not send the application to Middleton for verification before submitting it. (3 RT 623-624). Middleton's business entered in EIDL application was a hair and nail salon. Middleton actually occasionally groomed people's hair. (3 RT 626, 651-652). Alicia Quarterman told Middleton that her loan was not approved. However, Middleton received a loan of $5,500 from SBA. (3 RT 627-628).

Montgomery was charged by the Government with conspiracy to commit theft of government money amounting to $20,630. Montgomery signed a plea agreement and agreed to cooperate with the Government

because he was hoping for some consideration from the judge. (3 RT 662).

Nikia Wakefield was Montgomery's girlfriend. (3 RT 663). In 2020,

Wakefield told Montgomery that her cousin, Alicia Quarterman, could get

Montgomery approved for a small business loan of $10,000, out of which

$2000 would be the fee to get him approved. (3 RT 663). An EIDL

application was submitted on Montgomery's behalf by Alicia Quarterman,

which was ultimately denied. Montgomery had never heard Lawson's name.

(3 RT 663-664). In July 2020, Wakefield told Montgomery about another

loan he could possibly get approved for. Wakefield told the loan amount

Montgomery would get would be $20,000 out of which $10,000 should be

paid as fee. (3 RT 665). Montgomery ultimately received $20,000 on August

31, 2020, and sent a $10,000 check to Alicia Quarterman through USPS. (3

RT 666-667). Montgomery was not a business owner or a sole proprietor in

2020. (3 RT 676-677).

Adarin Jones met Alicia Quarterman when he was a store manager at

the Tyrone. Alicia Quarterman told Jones that she could get him a $10,000

COVID grant that was forgivable, out of which she were to charge $2,000.

(3 RT 689-690, 697-698). Jones did not know Lawson. (3 RT 692; 4 RT

718, 719). Jones was charged by the Government with conspiracy in regard

to the COVID grant and Jones pled guilty to it. (3 RT 694). Jones' mother also obtained an EIDL grant through Alicia Quarterman. (3 RT 703-704).

Linda Downing investigated Lawson's bank statements to determine where her money was coming from and where it was going. (4 RT 727-728). The fee charged by Lawson for filing EIDL and PPP applications varied and Downing did not know the reason for this variance. (4 RT 729). Downing reviewed text messages of Lawson, Alicia Quarterman, as well as some of the other applicants who texted Lawson. Downing also reviewed the actual EIDL or PPP applications. (4 RT 732). Downing suspected that at least $180,000 worth of grants were paid out to applicants who filed fraudulent EIDL and PPP applications or received fraudulent EIDL and PPP loans. (4 RT 740-741). Downing testified that she was able to trace $49,500 from Lawson's Bank of America account (excluding $15,000 which was received through CashApp), $21,000 from Lawson's Capital One bank account, $35,701 from Lawson's bank account in JPMorgan Chase, $10,026 from CashApp, $8,000 from Navy Federal Credit Union account, $17,000 from Wells Fargo account and $19,500 from another Wells Fargo account. (4 RT 744-746).

According to Downing, Lawson used money from five different bank accounts to purchase her Mercedes-Benz. (4 RT 756, 780). Downing

testified that she was able to trace the funds used by Lawson to purchase Mercedes-Benz, Suzuki motorcycle and to pay off for Infinities to the money received by Lawson from filling out applications for EIDL and PPP grants. (4 RT 754-761, 784-794). Ronald Solomon sent an introductory text message to Lawson on July 28, 2020, which was well after the loan was funded to Solomon on July 2, 2020. Downing agreed that just because Solomon was granted a loan, it did not imply that the loan was taken fraudulently as a part of the alleged scheme because Solomon did not even know Lawson at the time. (4 RT 798-799). Downing agreed that she could not be certain that the amount used by Lawson from her bank account to pay for Mercedes or for making other payments came from a particular source. (4 RT 806-808).

## C. Argument

The due process clause of the Fourteenth Amendment protects a defendant except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. (*In re Winship* (1970) 397 U.S. 358, 364). Here, Lawson asserts that there was simply insufficient evidence to convict her of counts 2, 3, 4, 5, 6, 7, 8, and 12, which specifically referenced the EIDL applications. With regards to the EIDL applications, there was no affirmative evidence presented by the

government from which the jury could conclude that Lawson knew about the basis on which the SBA was determining who to grant the loans to.

Nora Hobbie, who was an attorney advisor at the Small Business Administration (SBA), testified that per policy of the SBA, the amount of the initial grant money given to individuals was based on the number of employees that was represented on the application. However, she admitted that that information, the SBA requirement of having a certain number of employees and getting $1,000 per employee, up to 10, was not part of the law and was not publicly available information as the CARES Act did not specify how the funds were allocated. (1RT 166-168).

As such, there was no evidence presented by the government that Ms. Lawson could have known that the number of employees was the factor that the SBA was relying on in order to determine how much of an EIDL grant to provide to an applicant. If that information was not publicly available, it could not be determined or said with certainty that Lawson knew that the number of employees was the key factor to put in the application to increase the EIDL grant amount. Thus, there was no evidence upon which a jury could make a finding of guilt beyond a reasonable doubt as to counts 2, 3, 4, 5, 6, 7, 8, and 12, as they all involved an EIDL application.

In conjunction, Lawson asserts that there was insufficient evidence to convict her of counts 2, 3, 4, 6, 7, and 11, which involved allegations against Lawson, Quarterman and others, as there was no evidence presented by the government to show that the information in the EIDL applications was false. The charges in Counts 2, 3, 4, 6, 7, and 11 contain alleged violations of 18 U.SC. § 1343 and § 1344, statutes which both require obtaining money or property "by means of false or fraudulent pretenses, representations, or promises." However, no one testified that the information contained in the EIDL applications was false and the government did not put forth evidence to verify the information was in fact false.

For example, counts 2 and 11 involved Tranesha Quarterman's EIDL application. Tranesha did not testify or state that the information on the application was false. For count 3, which involved Nikia Wakefield, she did not testify or state that any information in the application was false. Count 4 involved Darryl Washington, who also did not testify and count 6 involved James McFarland, who did not testify or share that the information in the EIDL application was false. In addition, count 7 involved Katie Quarterman who the government did not have testify and she did not state that the information contained in the application was false.

Additionally, Inspector Greenberg did not conduct a search of Lawson's business in Texas even though her PPP application indicated that her business was located in Texas and not in Georgia. (3 RT 497). The government did not provide any records from the state of Texas, which is where Lawson said her event planning business was located or from the Texas Secretary of state as they could have.

Likewise, Inspector Greenberg did not search for the businesses of Nikia Wakefield and Victor Montgomery in the states where their applications indicated their businesses were located (3 RT 496-498) and therefore it could not be deemed to have been false information if it was never verified. In addition, during trial, inspector Greenberg admitted that it was possible that a business does not necessarily have to be registered with the Georgia Secretary of State. (3RT 453-454). Inspector Greenberg testified about the narrow and limited search that he did of the Georgia Secretary of State's records, but no one was brought in by the government from the Georgia Secretary of State to testify about what type of businesses have to register or what is required. Thus, there has not been evidence presented from which a jury could conclude beyond a reasonable doubt that Ms. Lawson is guilty of those counts.

Furthermore, in relation to counts 10 and 11, which both charged Lawson with bank fraud, the government had to prove that Lawson had an intent to defraud a financial institution, specifically Cross River Bank, which was specifically alleged in Counts 10 and 11. However, the government did not provide any testimony about any conversations or text messages that involved an intent to defraud the bank. The government failed to focus on the banks, as there was not much mention of the banks aside from text messages presented that asked what the account number was or explained where the fees should be sent. Thus, the government did not display evidence of any intent to deceive and cheat or to defraud any bank by Lawson.

Moreover, in relation to count 13, the alleged money laundering offense, pursuant to 18 U.S.C. § 1957, the government would have had to prove that Lawson knew that the transaction involved property or funds that were the proceeds of some criminal activity and that the property or funds had a value of more than $10,000. They then would have to also show that the property was in fact proceeds of the conspiracy to commit money laundering.

While the government presented transactions and numbers that added up to more than $10,000, they were not specifically tied to money that came

from individuals who testified in court during Lawson's trial or individuals whose applications were observed during the course of Lawson's trial. The government failed to present any evidence that there was anything fraudulent or erroneous or wrong about their application. The government even neglected to present their applications at trial.

During trial, Downing agreed that just because Ronald Solomon was granted a loan, it did not imply that the loan was taken fraudulently as a part of the alleged scheme because Solomon did not even know Lawson at the time. (4 RT 798-799). However, the government had Solomon on a summary exhibit to try to prove Lawson was guilty of money laundering and listed the $10,000 EIDL amount in the exhibit even though that was before Solomon had even stared communicating with Lawson.

In addition, while count 13 states that Lawson used criminally derived money to purchase a white Mercedes Benz, Linda Downing testified and admitted that she could not be certain that the amount used by Lawson from her bank account to pay for the Mercedes or for making other payments came from a particular source. (4 RT 806-808). Inspector Greenberg had also admitted that Lawson may have other bank accounts and it was possible that her salary from Houston Rockets was going into other bank accounts

that Inspector Greenberg may not be aware of. (3 RT 453-454). Thus, Lawson could have even paid for the Mercedes with her salary money.

Consequently, the government failed to present evidence from which a jury could conclude that the $10,000 requirement and money amount was reached, which was shown to be from the count 1 Conspiracy to Commit Wire Fraud.

## Conclusion

It is respectfully submitted that, for the reasons stated, the judgement should be reversed.

August 14, 2024

SUBMITTED BY:

/s/Aaron Spolin
Aaron Spolin
Caitlin Dukes
Spolin & Dukes P.C.
11500 W. Olympic Boulevard
Los Angeles, CA 90064
310-424-5816

## Certificate of Compliance
## With Typeface and Word-Count Limitations

I, Aaron Spolin, counsel for Appellant Katrina Lawson and a member of the
Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 27
and Eleventh Circuit Rule 27-1, that the attached Brief of Defendant-
Appellant is proportionately spaced, has a typeface of 14 points or more, was
prepared using Microsoft Word for Mac, and contains 4861 words.


August 14 , 2024

/s/ Aaron Spolin

**Aaron Spolin**

## Certificate of Service

I, Aaron Spolin, counsel for Appellant Katrina Lawson and a member of the Bar of this Court, certify that, on August 14, 2024, a copy of this Brief was filed with the Clerk and served on the parties through the Court's electronic filing system. I further certify that all parties required to be served have been served.

/s/ Aaron Spolin

**Aaron Spolin**